NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0516n.06
Filed: July 24, 2006

**No. 05-1903**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | **ON APPEAL FROM THE** |
| v. | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE WESTERN** |
| HOMER O. SHOUP, JR., | ) | **DISTRICT OF MICHIGAN** |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

**BEFORE: KEITH and BATCHELDER, Circuit Judges; ALDRICH, District Judge.**[*]

**PER CURIAM**. The sole issue in this case is whether the district court's sentence of 51 months for Defendant-Appellant Homer O. Shoup, Jr., ("Shoup") was unreasonable in light of the changes to the sentencing guidelines after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). Pursuant to a plea agreement, Shoup pled guilty to making a threat against the Vice-President of the United States in violation of 18 U.S.C. § 871(a). The district court sentenced Shoup to 51-months imprisonment. For the reasons set forth below, we **AFFIRM** the district court's sentence.

**I.   BACKGROUND**

**A.   Factual Background**

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

Shoup is a Vietnam veteran with a long history of substance abuse and psychiatric problems. There is also evidence in the record that Shoup was sexually, physically, and emotionally victimized during his childhood. On October 29, 2004, Shoup made numerous threats against the Vice-President of the United States, Dick Cheney, and pled guilty to these crimes. The facts in this case were stipulated to by Shoup as part of his plea agreement. (*See* J.A. at 25-31.)

On October 29, 2004, the Friday before the national presidential election, at approximately 11:53 a.m., Shoup was in Grand Rapids, Michigan, and placed a cellular call to 911, which was answered by the Michigan State Police ("MSP") in Rockford, Michigan. In this call, Shoup stated, "I just dropped off a tape at TV 8 on College Avenue in Grand Rapids. And it explains that I'm on my way to Lansing. I've turned my van into a bomb, and I am going to crash it into the Capitol Center and try to kill Cheney." *Id*. at 26.

Prior to calling 911, Shoup drove from his home in Wayland, Michigan, to the studio of a Grand Rapids network news station. At the news station, he walked into the building carrying a video-camera bag, handed the bag to the receptionist, and told her that the bag contained an important videotape that she needed to look at quickly. *Id.* Shoup then walked out of the building. The receptionist, alarmed by Shoup's behavior, called the Grand Rapids Police Department ("GRPD"). The GRPD responded with Explosive Ordinance Disposal materials and after "disrupting" the package with a water cannon to ensure that it was not explosive, the GRPD took custody of the package.

The videotape consisted of an approximately 15-minute long recording that Shoup had made of himself reading from a prepared statement and also speaking contemporaneously. In the statement, Shoup voiced numerous complaints about the United States government, American society, and President George W. Bush's administration. Shoup also expressed his deep hatred of

both the President and the Vice-President. His complaints ranged from U.S. military actions in Iraq and civilian fatalities there, to global warming, to the activities of corporations such as Enron and Halliburton. *Id.* at 27. Shoup referred to the Vice-President's scheduled visit to Lansing, Michigan on October 29, 2004 and stated that he had loaded his van with gasoline and propane gas– which he described as "explosives"– and asserted that he was going to drive the van at high-speed into the Vice-Presidential venue in hopes of killing the Vice-President. *Id.* Shoup acknowledged that his attempt would also kill people other than the Vice-President and stated that he was sorry for the "collateral" damage he anticipated causing. *Id.* The tape also contained Shoup's farewell comments to his family and then concluded with the statement, "Here I come." *Id.*

As a result of the combined efforts of the MSP, the GRPD, the U.S. Secret Service, the Federal Bureau of Investigation ("FBI"), and the U.S. Attorney's Office, the MSP and GRPD located and arrested Shoup at approximately 1:40 p.m. in Grand Rapids. Arresting officers asked Shoup whether he had explosives in the van, and Shoup stated, "I have a five gallon can of gas, and some propane." *Id.* Officers asked him what he planned to do with it, and Shoup replied, "Kill Dick Cheney. Dick Cheney kills young boys all over the world, so I am going to kill Dick Cheney." *Id.*

On October 29, 2004, Vice-President Cheney was scheduled to appear at a campaign rally at the Capitol Center in Lansing, Michigan. This visit had been widely publicized during the preceding several days, and Shoup was aware of it. The advertised time of the rally was from 1:00 p.m. to 2:00 p.m. On the same day, at 10:31 a.m., Shoup purchased a full tank of propane gas and a gas-diffuser device for the propane tank near his home in Wayland, Michigan. Shoup placed all of these items in his van. Although his van already had a full tank of gas, Shoup also placed an additional full, five-gallon gas can in the van and then drove to Grand Rapids, Michigan. When he was arrested in Grand Rapids, Shoup was sitting alone in his van drinking beer, with a street map

of Lansing, Michigan on the front passenger seat.

According to a U.S. Secret Service explosives expert, if propane gas is diffused into an enclosed space, such as a van, in a sufficient concentration, the fuel-air mixture will explode if exposed to an ignition source. *Id.* at 28. Furthermore, the amount of gas in a standard propane tank is significantly greater than what is required to achieve that saturation level in a van. Shoup, a smoker, had a book of matches with him.

On the same date that the Vice-President was appearing in Lansing, Vice-Presidential candidate, Senator John Edwards (D-NC), was appearing at a campaign rally in Muskegon, Michigan. Both the Vice-President's and the Senator's visits took place on October 29, 2004. As a major candidate for the vice presidency, Senator Edwards was receiving full U.S. Secret Service protection. Both the Vice-President's and the Senator's protective details drew heavily upon assets of the MSP, surrounding county sheriff's departments, city police departments, and U.S. Secret Service field offices.

Shoup's 911 call to MSP was immediately relayed to the Secret Service. Because the Vice-President was in fact scheduled to be in the area from 12:30 p.m. to after 3:00 p.m., and because the threat was an explicit one, the call resulted in immediate efforts by the MSP, the GRPD, the Secret Service, the FBI, and the U.S. Attorney's Office to identify and locate Shoup. The investigative response to Shoup's threats involved a significant expenditure of time for the various federal and state agencies involved. There was also an extensive search at Secret Service headquarters in Washington, D.C. of two computer hard-drives seized from Shoup's home pursuant to a federal search warrant.

Based on the foregoing facts, Shoup admitted the following: (1) that his threats against the

Vice-President were deliberate, specific, and graphic and were made three days before Election Day; (2) that they were made at a time when the Vice-President was appearing less than an hour's drive from where the threats were communicated and referred specifically to that appearance; and (3) that they were made at the same time that another Secret Service charge, Senator Edwards, was appearing a short drive away in Muskegon at a campaign rally. Thus, federal, state, and local law enforcement agencies were tasked with providing security for two major events and guaranteeing the safety of two major political figures– and of the general public attending the events or otherwise affected by the candidates' presence– at the same time in the same part of the state.

Shoup also admitted that, under these circumstances, his threats required significant expenditure of resources at a time when resources were being extensively utilized, and that substantial efforts were made to identify, locate, and arrest him without disturbing either campaign appearance or disrupting the plans of the thousands of citizens who had devoted time and energy to attending those appearances.

After his arrest, Secret Service and FBI agents interviewed Shoup at the GRPD. After being warned that he was suspected of violating 18 U.S.C. § 871(a) by communicating a threat to kill the Vice-President, Shoup admitted making the 911 call, but he denied that he intended to carry out his threat. Instead, he stated, he made his threat in order to force the cancellation of the Vice-President's scheduled visit to Lansing.

On appeal before this Court – despite the admissions above – Shoup also argues that he never intended to actually attempt to kill the Vice-President. He contends he only intended to commit suicide and made the tape and the threats in order to express his views about his disagreement with the government's policies and the actions in the Middle East. It is undisputed

in the record that Shoup has been plagued by depression throughout his life and has a very troubled and abusive past.

**B.      Procedural Background**

Shoup was arrested on a criminal complaint. A few days after his arrest, he appeared in court for a preliminary examination at which time defense counsel moved for a psychiatric evaluation. After a written motion was filed, an order of commitment was entered. After the evaluation was conducted, however, Shoup withdrew the motion and was arraigned on a single-count indictment charging him with making a threat against the Vice-President of the United States in violation of 18 U.S.C. § 871(a). Shoup eventually pleaded guilty pursuant to a plea agreement. In the agreement, Shoup admitted to many facts on which sentencing enhancements were based.

On March 17, 2005, Shoup's plea agreement was entered. According to the terms of the agreement, Shoup agreed to plead guilty to the indictment. The indictment charged Shoup with Making a Threat Against the Vice President of the United States, in violation of 18 U.S.C. § 871(a).[1] Specifically, the indictment read:

On or about October 29, 2004, in Grand Rapids, Kent County, in the Southern

---

[1] 18 U.S.C. § 871(a) reads:

Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

Division of the Western District of Michigan, the defendant, Homer O. Shoup, Jr., knowingly and willfully made a threat to take the life of the Vice President of the United States, did engage in conduct indicating an intent to carry out that threat, and did cause substantial disruption of governmental functions.

(J.A. at 24.)

In anticipation of sentencing, Shoup presented letters from family and friends, along with evidence concerning his well-documented emotional problems and depressive episodes. The Government, in turn, presented the testimony of the lead Secret Service agent in the case and played the court excerpts from Shoup's videotaped statement. The district court also had before it Shoup's Presentence report, which provided a detailed summary of the factual stipulations regarding the offense and Shoup's statements regarding his personal history.

Although the Government argued vigorously for the statutory and Sentencing Guidelines maximum sentence of 60 months incarceration, and although the Probation Office recommended a sentence of 54 months, the district court imposed the lowest end of the advisory range of 51 months. Specifically, on June 17, 2005, Shoup was sentenced to 51 months in prison and fined $3,000. On June 23, 2005, Shoup timely filed his notice of appeal with this Court.[2]

## II. ANALYSIS

### A. STANDARD OF REVIEW

Sentences imposed under an advisory Sentencing Guidelines regime are reviewed for reasonableness. *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005). Whether a sentence is reasonable depends upon a balancing of the factors set forth in 18 U.S.C. § 3553, including the applicable Sentencing Guideline range. *See United States v. Jackson*, 408 F.3d 301, 304-05 (6th Cir.

---

[2] This Court has appellate jurisdiction over appeals from final judgments of the district court under 28 U.S.C. § 1291.

2005). This Court has declined to hold that sentences within the Guideline range are reasonable *per se*. *See Webb*, 403 F.3d at 385, n.9. Sentences properly calculated under the Guidelines, however, are given a rebuttable presumption of reasonableness. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006).

**B.      DISCUSSION**

Shoup, through counsel, argues that the district court failed to properly consider his history of psychological problems when sentencing him to 51 months imprisonment. Shoup argues that the district court's sentence was both procedurally and substantively unreasonable.

**1.      Shoup's sentence was neither procedurally nor substantively unreasonable.**

Procedurally, Shoup argues that his sentence was unreasonable because the district court failed to give proper consideration to a meritorious ground for mitigation that he had proven, namely, his history of severe emotional problems. Substantively, Shoup relies on sentencing factor § 3553(a)(6), which instructs sentencing courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," to argue that the district court's sentence was substantively unreasonable. Specifically, he argues his sentence must be unreasonable because it was significantly higher than the sentence given to Lowell Timmers ("Timmers"), a gentleman who pled guilty to threatening to blow up the White House and holding "a significant portion of Washington, D.C., hostage for several hours" in the district court for the District of Columbia. Appellant's Reply Br. at 2. Shoup's procedural and substantive arguments fail for three reasons.

First, Shoup's procedural argument is factually incorrect. The district court did consider Shoup's history of psychological problems. Specifically, the district court stated during sentencing,

> [t]hese cases are never easy. In fact, no sentence is ever easy. [Mr. Shoup is] a person who has suffered from some mental or emotional problems and personality problems, perhaps. I'm no psychologist or psychiatrist, and I can only react to what I read and what I've observed here. Even observing this tape, it was interesting to see that he puts himself under an enormous amount of emotional stress. . . . So I can certainly see, from the tape and from the presentence investigation report and what [his attorney] said, that he is a person that is – was suffering from an enormous amount of stress; albeit, not to the point that he was mentally disabled or mentally incompetent under the law. He is certainly responsible for his conduct.

(J.A. at 108-09.) Moreover, the district court also noted on the record that it had considered the numerous letters written on Shoup's behalf, which recounted in detail his history of sexual abuse and the depression that resulted from that abuse. The fact that the district court did not consider Shoup's psychological history to the extent that Shoup and his counsel would have preferred is irrelevant and does not make his sentence unreasonable.

Second, the district court's obvious sympathy for Shoup notwithstanding, the court properly considered the § 3553 factors when discussing the seriousness of Shoup's actions. Specifically, the court stated, "in my judgment, the offenses are extremely serious." *Id.* at 109. The court went on to state,

> [b]ut threats and actual use of violence is enormously disruptive to our political process. So it's not just Dick Cheney I'm worried about. I never met Mr. Cheney. But it's also the threat to the very foundations of our democratic process here in the United States of America. So it's a very serious offense.

*Id.* at 111. Therefore, the court concluded,

> we have to promote the respect for the law and provide for just punishment. That's one of the things set forth in 18 United States Code 3553(a)(2): afford adequate deterrence to criminal conduct, protect the public from further crimes of this defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. And in this particular case, I think that a judgment within the sentencing guideline range would be appropriate.

*Id*. The court went on to acknowledge,

[n]ow, from his family's point of view, it might seem harsh because they can have certain sympathies for the defendant. The defendant might think it's harsh. His attorney might think it's harsh. But I think, then, they ought to sit back and take a look at what actually happened here; and that was a threat that required the resources of all the police agencies [the Michigan State Police, Grand Rapids Police Department, U.S. Secret Service, the FBI, and the U.S. Attorney's Office], and a potential disruption of not just one political rally but also the democratic process in the United States.

*Id.* at 111-12. Finally, it is important to note that when the district court ultimately announced the 51-month sentence, the court also stated the following:

[s]o it is the Court's intent to impose a sentence of – because I think also the defendant has shown remorse, I don't think a sentence at the high end of the guideline range is appropriate. It could be appropriate. But it is not necessary. So the sentence would be 51 months incarceration[.]

*Id.* at 112.

Third, and finally, Shoup's substantive argument fails because he cannot rely on the Timmers's case to prove that his sentence was unreasonable. On this issue, Shoup argues that because Timmers negotiated a 34-month sentence for making a bomb threat outside the White House during rush hour in Washington, D.C., "any amount of incarceration imposed on Mr. Shoup that exceeds the sentence imposed on Mr. Timmers is unreasonable." Apellant's Br. at 20. This argument lacks merit for several reasons.

Although Shoup is correct that § 3553(a)(6) requires that there not be marked disparities in sentencing for the same offenses, this is not an issue in this case because Shoup's case is entirely distinguishable from that of Timmer's case. First, Shoup and Timmers were convicted of different offenses. As such, Timmers' applicable Guidelines range was 31-37 months, while Shoup's range was 51-60 months. Second, Shoup's attempts to characterize Timmers' conduct as more severe than his own must be rejected. Specifically, he argues that Timmers "engaged in much more directly

threatening behavior." Appellant's Reply Br. at 4. What Shoup fails to address is that Timmers threatened to blow up the White House, a building, because of what it represented whereas Shoup threatened to blow up and kill a human being, namely, the nation's second-highest executive branch official. Therefore, all of Shoup's arguments that his sentence is unreasonable fail.

## II. CONCLUSION

The district court's sentence was reasonable. The court considered both the applicable guidelines range and the § 3553 factors. The district court even elected not to give Shoup a sentence at the top of the sentencing guidelines range of 60 months because the district court concluded a maximum sentence was unnecessary in this case given Shoup's display of remorse. In addition, Shoup's 51-month sentence was at the bottom of the advisory Sentencing Guidelines range, and the monetary fine was below that range, as well. In addition, the district court recommended to the Bureau of Prisons that Shoup should participate in a drug-rehabilitation program and continue to be provided with mental-health treatment. The Timmers case is inapplicable to the facts of this case. Ultimately, Shoup has failed to overcome the rebuttable presumption of reasonableness that we must apply to this case. Therefore, Shoup's sentence was reasonable.

For the foregoing reasons, we **AFFIRM** the district court's imposed sentence of 51-months imprisonment for Shoup.